Defendants represented that Apligraf sales were sufficient. That impression was substantially reinforced when the Novartis agreement was allegedly amended during the Class Period to provide even more revenues to the Company.

51. In addition to simply marketing Apligraf, Novartis was also a significant owner of Organogenesis' shares, and during the Class Period owned as many as 2.8 million Company shares -- or over 6% of Organogenesis' shares issued and outstanding. Novartis had acquired its shares in the Company through several private equity investments, as well as through certain funding agreements which purportedly allowed Organogenesis to sell stock to Novartis at prices predetermined and at the election of the Company.

52. The purported ability of the Company to be able to sell stock to Novartis was also purportedly a critical part of Organogenesis' financing, because it should have allowed Defendants to raise money whenever necessary – up to $20 million in equity financing in addition to any other necessary sources of debt or equity financing available to the Company. Again, this financing was also very important to investors, because it provided a purported "safety net" for Organogenesis -- a reserve of cash which Defendants could allegedly access as a last resort. The Novartis put agreement was, therefore, during the Class Period, a critical part of Defendants' announced plan to achieve profitability and to avoid bankruptcy,

53. At all times during the Class Period, therefore, Organogenesis represented that it was able to make Apligraf commercially available in a cost-effective manner which, even if the Company was forced to incur losses at the early stages of development, would allow Organogenesis to ramp up production and soon be able to fund operations from sales. Defendants consistently represented

both prior to and during the Class Period that the Company was sufficiently well funded to carry out Defendants' business plan.

54.     Unbeknownst to investors, however, throughout the Class Period, the Company was suffering from a host of undisclosed, adverse factors which were negatively impacting its business and which would cause it to report declining financial results, materially less than the market expectations Defendants had caused and cultivated. In particular:

(a)     At all times during the Class Period, it was not true that Defendants could achieve profitability through the sale of Apligraf under the terms, or even the revised terms, of the Novartis marketing agreement, which did not provide Organogenesis with enough of the revenues or profits provided through such Apligraf sales to offset the extremely high cost of production or to offset other undisclosed manufacturing problems such as defective products and recalls.

(b)     Throughout the Class Period, undisclosed problems related to the manufacture and marketing of Apligraf were leading to even higher costs and further reducing profitability. Manufacturing problems and delays were retarding production scale, and marketing issues were reducing sales. As investors would only learn following the Class Period, the Company's own sales force was encountering resistance throughout that time concerning the cost and complexity of its products and the actual and/or perceived difficulties in physician reimbursement for Apligraf.

(c)     Throughout the Class Period, Organogenesis was underfunded and there was no reasonable basis to report that the Company could foreseeably fund operations throughout the Class Period, based on available sources of loans, debt and/or equity sales. Moreover, as

Defendants were well aware but failed to disclose, it was not true that the Company could force Novartis to provide the full complement of its funding as Defendants consistently represented, as certain undisclosed conditions existed.

(d) Organogenesis could not meet conditions precedent to Novartis' requirement to provide at least $10 million of its purported commitment to Organogenesis. It was not true that other sources of funding remained available to Defendants so as to preserve corporate viability.

(e) Throughout the Class Period, Defendants failed to disclose that the high management turn-over at the Company was having and would continue to have a disruptive effect on the operations and oversight of Organogenesis, such that it was also not foreseeable at any time during the Class Period that Organogenesis would be able to achieve profitability in the near-term or to attain guidance sponsored and/or endorsed by Defendants.

(f) As a result of the aforementioned adverse conditions which Defendants failed to disclose, throughout the Class Period, Defendants lacked any reasonable basis to claim that Organogenesis was operating according to plan, that sufficient sources of funding were achieved and/or available to Organogenesis or that the Company could maintain profitability or even remain a viable entity in the foreseeable near-term.

55. Defendants were motivated to and did conceal the true operational and financial condition of Organogenesis, and materially misrepresented and failed to disclose the adverse conditions that were adversely affecting Organogenesis throughout the Class Period, because these actions enabled Defendants and Company insiders to sell over 6.2 million shares of Company stock and/or securities valued at over $68.8 million, prior to any disclosure to the market.

### Defendants' Materially False and Misleading
### Statements Made During the Class Period

56. **"Puzzle" Nears Completion.** The Class Period begins on November 15, 1999. On that day, Organogenesis published a release on *Business Wire* announcing financial results for the 3Q:99, the period ending September 30, 1999. For 3Q:99, Organogenesis reported total revenue of $946,000, equal to a net loss of $0.21 per share, compared to a net loss of $0.25 per share the prior quarter. According to the release, total expenses for 3Q:99 were $7.426 million, including one-time technology acquisition charges of $900,000, compared to a sequential loss of $8.527 million. This release also quoted Defendant Stein, as follows:

> Apligraf is a revolutionary technology development to provide significant advantages in wound healing. Apligraf is FDA approved, well-received by physicians and can be a highly cost-effective therapy for many patients. ***The key remaining piece of the puzzle is gaining broad, standardized reimbursement....*** [Emphasis added.]

A subsequent release, dated 12/2/99, reported that Apligraf sales reached 755 units in 11/99.

57. Following the publication of the Company's earnings announcement, the price of Organogenesis rallied -- trading from a low of $6.81 per share on November 15, 1999, to above $12.30 per share on December 2, 1999.

58. **$50 Million Shelf-Registration.** Taking full advantage of the artificial inflation in the price of Organogenesis' stock caused by the publication of Defendants' false and materially misleading statements, Defendants raced to the market to register for sale at least $50 million in mixed securities in a "shelf registration." The shelf registration would allow the Company to sell up to 3 million shares of common stock either directly or though convertible securities at the sole discretion of the Company.

59.     On January 13, 2000, Defendant Laughlin presented at the Hambrecht & Quist Annual Healthcare Conference held in San Francisco, California, where he reiterated former guidance and where he further conditioned investors to believe that the Company was operating according to plan. The following day, January 14, 2000, Defendant Laughlin also provided a widely circulated interview, with *The Wall Street Transcript*, during which he also represented, in part, that "we're not concerned that we won't ultimately be successful," despite the fact that the adoption of Apligraf had, to that point, "gone slower than we'd like."

60.     **3Q:99 Form 10-Q.** On or about February 14, 2000, Defendants filed with the SEC the Company's financial results for 3Q:99, the period ending September 30, 1999, pursuant to its Form 10-Q signed by Defendants Laughlin and Lopolito. The Company's 3Q:99 Form 10-Q contained the same materially false and misleading financial information as had previously been announced on December 15, 1999, in addition to the following:

> Basis of Presentation:
>
> The accompanying unaudited consolidated financial statements of Organogenesis, Inc., have been prepared in accordance with generally accepted accounting principles for interim financial information and with the instructions to Form 10-Q and Article 10 of Regulation .... *In the opinion of management, the accompanying consolidated financial statements include all adjustments, consisting of normal recurring adjustments, necessary for a fair presentation of the financial position, results of operations and changes in cash flows for the periods presented.* . . . [Emphasis added.]

61.     In addition to the foregoing, Organogenesis' 3Q:99 Form 10-Q also characterized rising costs during 3Q:99 as one-time events and predicted that costs would foreseeably remain in line with guidance, as follows:

>Production costs exceeded product sales due to the start-up costs of new product introduction and the high costs associated with low volume production. ***We expect production volume to increase and our margins to improve.*** We expect to continue to expand manufacturing operations and advance the product pipeline during the remainder of 1999 and into 2000. [Emphasis added].

Regarding the $6.2 million payment for the conversion of the Series C convertible preferred shares, the 3Q:99 Form 10-Q reported the existence of this payment, but it did not identify the recipients.

62.     The statements contained in Organogenesis' November 15, 1999 release and those statements made by Defendants to analysts, investors and the press during the period November 13-14, 1999, referenced above, were each materially false and misleading when made, and were known by Defendants to be false or were recklessly disregarded as such thereby, for the following reasons, among others:

(a)     At all times during the Class Period, it was not true that Defendants could achieve profitability through the sale of Apligraf under the terms, or even the revised terms, of the Novartis marketing agreement, which did not provide Organogenesis with enough of the revenues or profits provided through such Apligraf sales to offset the extremely high cost of production or to offset other undisclosed manufacturing problems such as defective products and recalls;

(b)     That, at all times during the Class Period, unbeknownst to investors, pursuant to the terms of the Novartis sales and distribution agreement, the Company was losing money on each sale of Apligraf, such that it was impossible to achieve profitability or operate the Company without the constant and never-ending need to raise money to fund operations;

(c)     Throughout the Class Period, undisclosed problems related to the manufacture and marketing of Apligraf were leading to even higher costs and further reducing profitability.

Manufacturing problems and delays were retarding production scale and marketing issues were reducing sales. As investors would only learn following the Class Period, the Company's own sales force was encountering resistance throughout that time due to the cost and complexity of its products and the actual and/or perceived difficulties in physician reimbursement for Apligraf;

(d)   Throughout the Class Period, Organogenesis was underfunded and there was no reasonable basis to claim that the Company could foreseeably fund operations throughout the Class Period, based on available sources of loans, debt and/or equity sales. Moreover, as Defendants were well aware but failed to disclose, it was not true that the Company could force Novartis to provide the full complement of its funding as Defendants consistently represented, as certain undisclosed conditions existed which Organogenesis could not meet. These conditions were precedent to Novartis' requirement to provide at least $10 million of its purported commitment to Organogenesis. Thus, it was not true that other sources of funding remained available to Defendants so as to preserve corporate viability;

(e)   Throughout the Class Period, Defendants failed to disclose the Company's high management turn-over which had and would continue to have a disruptive effect on the operations and oversight of Organogenesis, such that it was not foreseeable at any time during the Class Period that Organogenesis would be able to achieve profitability in the near-term or meet the projections sponsored and/or endorsed by Defendants; and

(f)   As a result of the aforementioned adverse conditions which Defendants failed to disclose, throughout the Class Period, Defendants lacked any reasonable basis to claim that Organogenesis was operating according to plan, that sufficient sources of funding were achieved

and/or available to Organogenesis or that the Company could maintain profitability or even remain a viable entity in the foreseeable near-term.

63.     **$9.4 Million Equity Sale.** One month later, on February 24, 2000, with Organogenesis' stock trading at almost $17.00 per share, Defendants issued a release announcing that Organogenesis had completed the sale of over 688,000 shares of common stock for gross proceeds of $9.4 million. According to Defendants, this was a remarkable accomplishment given that it allowed them to raise more money than Defendants had originally planned -- and presumably placed Organogenesis in a position of having more money than needed to fulfill Defendants' near-term objectives. According to the Company's release, Defendants' purported "goal" had been to raise $6.2 million but the offering priced at $14 per share was over-subscribed. This placement raised the total number of Organogenesis' shares outstanding to 31.3 million from 30.6 million.

64.     At the time of this offering, the Company stated that proceeds from the sale of these shares would enable, among other things, the retirement of $6.2 million in preferred stock. Defendants created the impression that the redemption of Organogenesis' preferred stock was necessary to bolster the Company's debt and equity ratings. The Company's February 24, 2000 release quoted Defendant Tuck, who exhibited a complete knowledge of Organogenesis' financial and operational performance, stating that "[t]he completion of this shelf-offering removes any concern among the investment community about the retirement of our $6.2 million of preferred stock. No disclosure was made as to the identity of the owners of these retired preferred shares."

65.     Moreover, the following day, February 25, 2000, Defendants also issued a release announcing that they had raised an additional $1.4 million through the sale of an additional 100,000 shares to satisfy an additional over-subscription commitment. This sale brought the total February

2000 Offering proceeds to over $10.8 million, and the total number of shares issued and outstanding to 31.4 million.

66. **$16 Million In Equity Sales.** Taking further advantage of the artificial inflation in the price of Organogenesis' stock that Defendants' misrepresentations and omissions had caused, on March 9, 2000, Defendants sold another 300,000 shares of Organogenesis' common stock at approximately $17.60 per share in a private-placement, thereby realizing another $5.27 million. Including this latest offering, the Company had issued a total of 1.088 million shares in less than 20 days in combined placements valued at over $16 million.

67. On March 7, 2000, shares of the Company rallied to a Class Period high of over $22.37 per share on substantial volume of over 1.5 million shares, driven by managements' optimistic guidance, and the false and misleading assurances that the Company was operating according to plan -- capable of achieving profitability in the near-term -- and that the Company had raised enough money to fund operations. Within days, however, on March 13, 2000, Defendant Stein suddenly and unexpectedly announced that he was resigning from the Board of the Company. Defendant Stein had only accepted the position of Chairman Emeritus of the Board in January 2000, after resigning as Chairman and Chief Executive Officer effective January 1, 2000. At the time of his resignation, no disclosure was made regarding the Company's inability to generate sufficient funds from operations or sources of debt or equity to allow Organogenesis to achieve profitability, or to foreseeably remain as a viable business.

68. On or about March 21, 2000, as President and CEO of Organogenesis, Defendant Laughlin showcased a presentation of the Company at the New York Society of Securities Analysts 4th Annual Health Care Conference held in New York City.

69. **$6.2 Million Series C Redemption.** Consistent with Defendants' earlier announcement, on March 27, 2000, Organogenesis issued a release which reported that Defendants had opted to use at least $6.2 million of its recently raised cash to pay for the redemption of the Company's outstanding Series C convertible preferred stock. According to the Company's release, the Series C convertible stock had a mandatory conversion date of March 26, 2000, but these shares were redeemable in either common stock or cash, at the option of Organogenesis. The Company's release did not reveal why the cash election was chosen by Organogenesis or who received the cash payments as a result of this redemption.

70. **4Q and FY:99 Results.** On March 31, 2000, Organogenesis issued a release published on *Business Wire* which purported to announce financial results for 4Q and FY:99. According to the Company, results for 4Q and FY:99 were "consistent with the transition in progress from a research focused company to a research based operating company with a novel medical product in introduction phase," in addition to stating the following:

> For the year ended December 31, 1999, revenue from product sales to related party and others was $1.8 million, compared with $1.1 million in 1998. Total revenues were $3.6 million for 1999, compared with $9.0 million in 1998, which included $6.8 million in milestone payments from Novartis Pharma AG. Total expenses (including manufacturing, research and development, and general and administrative costs) were $31.9 million in 1999, compared with $23.0 million in 1998. Net loss was $0.93 per share (or $28.4 million) for 1999 compared with a net loss of $0.48 per share (or $14.0 million) for 1998.
>
> The *increase in expenses was primarily due to: strengthening our employee base* through additions to our production, research and support teams; costs to support publication studies and other sponsored programs, as well as increased activities in our corporate communications and business development functions; interest expense on the convertible debt issued last March; *expanding our*

> *production and warehouse capacity while consolidating our administrative space*; and the acquisition of intellectual property and assets from Baxter Healthcare Corporation. [Emphasis added.]

In addition to the foregoing, Defendant Laughlin also used this release to condition investors to believe that the Company was operating according to plan and was actually taking steps to reduce operating costs, as follows:

> Prior to the US commercialization of Apligraf, our corporate focus needed to be on supporting the validity of the product concept through solid research, clinical trials and manufacturing consistency .... *Now, as sales of Apligraf begin to develop, our focus must include driving down per unit manufacturing costs through the development and implementation of more efficient methods of production.* At the same time, we are continuing to support other programs in our pipeline - the VITRIX(TM) living soft tissue replacement product, the vascular graft, the liver assist device - important to our longer term growth. [Emphasis added.]

71.   **FY:99 Form 10-K.** The same day, March 31, 2000, Organogenesis also filed with the SEC its financial results for full year 1999, pursuant to Form 10-K signed by Defendants Laughlin, Erani and Lopolito, among others. In addition to repeating many of the same misrepresentations made in the Company's release, the 1999 Form 10-K also stated that Organogenesis *"believe[s] that future capital comprised of product sales, research and development support payments and debt equity financings will be sufficient to fund future operations into 2001."* (Emphasis added). Following the filing of Organogenesis' 2000 Form 10-K, shares of the Company traded as high as $12.60 per share on March 31, 2000.

72.   The statements made by Defendants and contained in the Company's 3/31/00 release and 1999 Form 10-K, reproduced herein *supra*, were each materially false and misleading and were

know by Defendants to be false at that time, or were recklessly disregarded as such for the reasons stated herein in ¶ 62 *supra*.

73.  **Stein Stock Registration.** Taking full advantage in the artificial inflation in the price of Organogenesis which Defendants' false statements had caused, on or about April 21, 2000, Defendant Stein caused the Company to file with the SEC a Registration Statement allowing him to register for sale over 732,000 shares of his personally held Organogenesis' stock. The Registration Statement, signed by Defendants Laughlin, Lopolito and Erani, among others, stated in part the following:

\* \* \*

> This Prospectus is part of a Registration Statement we filed with the Securities and Exchange Commission for registration of up to 732,423 shares of Common Stock for sale by the selling stockholder listed on page 12 of this prospectus.
>
> Each of the shares to be sold was issued upon the exercise of options held by the selling stockholder. The selling stockholder may offer his common stock through transactions on the American Stock Exchange, in private transactions at current market prices or at negotiated prices.
>
> *We will not receive any of the proceeds from the selling stockholder's sale of his common stock.*
>
> \* \* \*
>
> USE OF PROCEEDS
>
> We will receive no net proceeds from the sale of the common stock. *All proceeds will be realized by the selling stockholder.*
>
> SELLING STOCKHOLDER
>
> *The selling stockholder, Herbert M. Stein, is offering shares which have been acquired by him upon the exercise of options granted under a stock option grant.* Mr. Stein previously served as Chairman

00001957.WPD ; 1                                32

and Chief Executive Officer of the Company until his retirement on December 31, 1999 and as a member of the Board of Directors of the Company until March 17, 2000. The following table lists the selling stockholder and other information regarding beneficial ownership of the common stock by the selling stockholder as of March 29, 2000:

| Name | Number of Shares Beneficially Owned Prior to the Offering | Number of Shares Being Offered | Number of Shares Beneficially Owned After the Offering | Percentage of Class to be Beneficially Owned After offering |
|---|---|---|---|---|
| Herbert M. Stein | 2,086,597 | 123,423 | 1,363,174 | 4.0% |

This registration represented almost half of Defendant Stein's personal holdings (excluding approximately 1.1 million shares of common stock held by H.M. Stein Associates to which Defendant Stein disclaims beneficial ownership).

74.   **1Q:00 Results.** On May 11, 2000, Organogenesis issued a release published on *Business Wire* which purported to announce financial results for the 1Q:00. Defendants again stated that the Company's quarterly results were "consistent with the Company's ongoing transition from being a research company to being a research-based operating company," in addition to stating the following:

> Revenue from product sales to related party and others were $646,000 for 1Q:00 compared with $543,000 for 4Q:99. The growth in product revenue was due to increased sales of Apligraf(®) to Novartis. Total revenues were $1,084,000 for 1Q:00 compared with $1,015,000 for 4Q:99. Total costs and expenses were $7,770,000 for 1Q:00 compared with $9,368,000 for 4Q:99, which had included disproportionately higher occupancy and financing costs. Net loss was $0.21 per share (or $6,686,000) for 1Q:00 compared with $0.27 per share (or $8,353,000) for 4Q:99.
>
> The 1Q:00 product revenues of $646,000 compare with $318,000 for 1Q:99. The total revenues of $1,084,000 compare with $679,000 for the same quarter in 1999 and the total costs and expenses of

> $7,770,000 compare with $6,605,000 for the same quarter in 1999. The net loss of $0.21 per share (or $6,686,000) compares with a net loss of $0.19 per share (or $5,926,000) for the same quarter in 1999.

This release also quoted Defendant Laughlin as follows:

> ***Key to Apligraf sales development are two factors: obtaining approval for diabetic foot ulcers and gaining standardized Apligraf reimbursement...*** The Advisory Panel's recommendation earlier this week is a key achievement towards the diabetic foot ulcer indication. We are equally committed to gaining standardized reimbursement for Apligraf. [Emphasis added].

75.  **1Q:00 Form 10-Q.**  On or about May 15, 2000, Defendants filed with the SEC the Company's financial results for 1Q:00, the period ended March 31, 2000, pursuant to Form 10-Q signed by Defendants Laughlin and Arcari. The Company's 1Q:00 Form 10-Q contained the same materially false and misleading financial information as had previously been announced on May 11, 2000, in addition to reporting, in part, the following:

> Basis of Presentation
>
> ----------------------------------------
>
> The accompanying unaudited consolidated financial statements of Organogenesis Inc. have been prepared in accordance with generally accepted accounting principles for interim financial information and with the instructions to Form 10-Q and Article 10 of Regulation S-X .... ***In the opinion of management, the accompanying consolidated financial statements include adjustments, consisting of recurring adjustments, necessary for a fair presentation of the financial position, results of operations and changes in cash flows for the periods presented....***
>
> \* \* \*
>
> Costs and Expenses
>
> Cost of product sales: Cost of product sales was $1,191,000 for the three months ended March 31, 2000, compared to $603,000 for the same period in 1999, due to increased unit sales of Apligraf to

Novartis. Cost of product sales includes the direct costs to manufacture and package Apligraf and an allocation of our production related indirect costs. Cost of product sales exceeded product sales due to the start-up costs of new product introduction and the high costs associated with low volume production. We expect production volume to increase and our margins to improve. We expect to continue to expand production operations during 2000. [Emphasis added].

76. The statements made by Defendants and contained in the Company's 5/11/00 release and 1Q:00 Form 10-Q, reproduced herein *supra* were each materially false and misleading and were known by Defendants to be false at that time, or were recklessly disregarded as such for the reasons stated herein in ¶ 62 *supra*.

77. On or about June 14, 2000, as President and Chief Executive Officer of Organogenesis, Defendant Laughlin showcased a presentation of the Company at the Annual Sachs Healthcare Conference in Laguna Niguel, CA.

78. On June 20, 2000, Organogenesis issued a release which announced that the FDA had given final approval of Apligraf treatment for diabetic foot ulcers in addition to its previous indication of venous leg ulcers. While no changes had been made to Apligraf for this market application, the FDA indication purportedly allowed Organogenesis to expand its market base to include this second group of foot ulcer sufferers. On this news, Organogenesis' stock traded as high as $12.75 per share in intra-day trading.

79. **Laughlin on CNBC Power Lunch.** On June 25, 2000, Defendant Laughlin appeared on the widely disseminated cable financial news show "Power Lunch," on the CNBC network. When asked by the CNBC interviewer whether Organogenesis had the ability to obtain profitability through sales of the Company's only product Apligraf, Defendant Laughlin responded by stating that Organogenesis "can become profitable and will become profitable with Apligraph

alone. The two main drivers of that are diabetic foot ulcer approval which happened last week and getting that standardized Medicare reimbursement, which has been slow going. *We're optimistic ....*" (Emphasis added).

80. **Apligraf Sales 7/00.** On August 2, 2000, Organogenesis issued a release which purported to announce Apligraf sales for the month of July 2000. According to this release, sales of Apligraf had declined substantially from the prior month, reaching only 912 units in July. According to Defendant Laughlin, however, the decline in sales was the result of the "summer vacation period" and *not* the result of any production problems within the Company or any issues with product quality or product acceptance. Rather, according to Defendant Laughlin, slow July 2000 sales were the result of *one-time events* that would be resolved as a result of Organogenesis receiving approval of Apligraf for foot ulcers and the recent approval by Medicare for reimbursement, which would allow customers to recover the cost of Apligraf.

81. **2Q:00 Results.** On August 14, 2000, Organogenesis issued a release published on *Business Wire* which purported to announce financial results for the 2Q:00. This quarter, Defendants stated that the Company was "in the process of transitioning from being a research company to becoming an operating company with a strong research base," in addition to stating the following:

> For 2Q:00, total revenues were $6.4 million compared with $0.9 million for the same quarter in 1999. The 2000 revenues include a $5 million milestone payment from Novartis that was received in March and earned in June with the approval of Apligraf for diabetic foot ulcers. Total costs and expenses were $8.5 million during the second quarters of both 2000 and 1999. The 1999 expenses included a non-cash charge of $0.9 million for a technology-related acquisition, while the 2000 expenses show modest increases across each expense category. Net loss was $2.0 million ($0.06 per share), compared with a net loss of $7.6 million ($0.25 per share) for the same quarter in 1999.

The Company reportedly had $22.3 million in cash, cash equivalents and investments at June 30, 2000.

82. In addition to reporting the following, the August 14, 2000 release was also used by Defendant Laughlin to condition investors to believe that Organogenesis had achieved certain milestones such that it was foreseeable that the Company could achieve profitability in the near-term. In this regard, Defendant Laughlin was quoted in the August 14, 2000 release, as follows:

> When we announced our first quarter results three months ago, we stated our commitment to achieving two important drivers of Apligraf sales: FDA approval for diabetic foot ulcers and Medicare reimbursement for the product's cost. ***We now have tangible achievements in both areas.*** Apligraf was approved for diabetic foot ulcers in June and its marketing was launched by Novartis in July. Effective this month, Apligraf qualifies for Medicare reimbursement when used in the hospital outpatient setting, such as a hospital-affiliated wound care center. There has also been progress in gaining Medicare reimbursement for Apligraf applied in the doctor's office, with additional activities underway. [Emphasis added].

83. **2Q:00 Form 10-Q.** The same day, August 14, 2000, Defendants also filed with the SEC the Company's financial results for 2Q:00, the period ended June 30, 2000, pursuant to Form 10-Q signed by Defendants Laughlin and Arcari. The Company's 2Q:00 Form 10-Q contained the same materially false and misleading financial information as had been previously announced, in addition to reporting, in part, the following:

> Basis of Presentation
>
> ---------------------------------------
>
> The accompanying unaudited consolidated financial statements of Organogenesis Inc. have been prepared in accordance with generally accepted accounting principles for interim financial information and with the instructions to Form 10-Q and Article 10 of Regulation S-X .... In the opinion of management, the accompanying consolidated

> financial statements include all adjustments, consisting of normal recurring adjustments, necessary for a fair presentation of the financial position, results of operations and changes in cash flows for the periods presented. . . .
>
> * * *
>
> COSTS AND EXPENSES
>
> Cost of product sales: Cost of product sales was $1,243,000 and $2,434,000 for the three and six months ended June 30, 2000, compared to $1,126,000 and $1,730,000 for the same periods in 1999, due to increased unit sales of Apligraf to Novartis. Cost of product sales includes the direct costs to manufacture and package Apligraf and an allocation of our production related indirect costs. ***Cost of product sales continues to exceed product sales due to the high costs associated with low volume production. We expect production volume to increase and our margins to improve. We expect to continue to expand production operations during 2000.*** [Emphasis added].

84. **Apligraf Sales 3Q:00.** On October 3, 2000, Defendants published a release on *Business Wire* which reported record Apligraf sales for September and 3Q:00 -- with 3Q:00 sales exceeding 3,000 units. According to this release the Company sold 1,081 units in 9/00 and a total of 3,232 units during 3Q:00. In addition to reporting the foregoing, this release also quoted Defendant Laughlin who stated that "***Third quarter Apligraf achievements .... laid the foundation for future sales development.***" (Emphasis added).

85. The statements made by Defendant Laughlin during the June 25, 2000 CNBC interview and other statements made by Defendants and contained in the Company's July 2, 2000 release and 2Q:00 Form 10-Q, reproduced herein *supra*, were each materially false and misleading and were know by Defendants to be false at that time, or were recklessly disregarded as such for the reasons stated herein in ¶ 62 *supra*.

86.   **3Q:00 Results.**  On November 14, 2000, Organogenesis issued a release published on *Business Wire* which purported to announce financial results for the 3Q:00. Again, Defendants heralded the achievements of Apligraf, reporting that Organogenesis was still "in the process of transitioning from being a research Company to becoming an operating Company with a strong research base." This release also stated, in part, the following:

> For the three months ended September 30, 2000, total revenues were $1.4 million compared with $0.9 million for the same quarter in 1999. The increase was due to increased product sales to a related party and others and increased income from grants and interest. Total costs and expenses were $8.3 million during 3Q:00 compared with $7.4 million for the same quarter in 1999.... Total costs and expenses were $8.3 million during 3Q:00 compared with $7.4 million for the same quarter in 1999. The increase was due to increased cost of product sales, research and development expenses, interest expense and general and administrative expenses. Net loss was $6.9 million ($0.20 per share), compared with a net loss of $6.5 million ($0.21 per share) for the same quarter in 1999.

In addition to the foregoing, Defendant Laughlin was also quoted in this release as conditioning investors to believe the following:

> This summer we made important progress in several areas central to Apligraf sales development. Apligraf was approved and launched for diabetic foot ulcers, qualified for Medicare reimbursement when used in the hospital outpatient setting and marketer Novartis expanded the field force selling the product. We believe the Apligraf sales growth seen in the third quarter is the beginning of the effect of these achievements on sales development. While unit volumes are still small, which adversely affects our cost of production, the trend is encouraging.

87.   **3Q:00 Form 10-Q.**  The same day, November 14, 2000, Defendants also filed with the SEC pursuant to Form 10-Q the Company's financial results for 3Q:00, the period ended September 30, 2000, signed by Defendants Laughlin and Arcari. The Company's 3Q:00 Form 10-Q

00001957.WPD ; 1                                                  39

contained the same materially false and misleading financial information as had previously been announced, in addition to reporting, in part, the following:

> Basis of Presentation
>
> ----------------------------------
>
> The accompanying unaudited consolidated financial statements of Organogenesis Inc. have been prepared in accordance with generally accepted accounting principles for interim financial information and with the instruction to Form 10-Q and Article 10 of Regulation S-X .... ***In the opinion of management, the accompanying consolidated financial statements include all adjustments, consisting of normal recurring adjustments, necessary for a fair presentation of the financial position, results of operations and changes in cash flows for the periods presented ....***
>
> * * *
>
> COSTS AND EXPENSES
>
> Cost of product sales: Cost of product sales was $1,310,000 and $3,744,000 for the three and nine months ended September 30, 2000, compared to $969,000 and $2,699,000 for the same periods in 1999, due to increased unit sales of Apligraf to Novartis. Cost of product sales includes the direct costs to manufacture and package Apligraf and an allocation of our production related indirect costs. Cost of product sales continues to exceed product sales due to the high costs associated with low volume production. ***We expect production volume to increase and our margins to improve.*** [Emphasis added].

88.  **Apligraf Sales 11/00.** Later, on December 4, 2000, Organogenesis announced that November sales of Apligraf were 1,488 units -- a new record monthly high. In addition, this release again quoted Defendant Laughlin who stated that: "We are clearly beginning to see acceleration in the growth of Apligraf sales. October and November establish a new, higher sales base on which to build. While it is difficult to predict how the December holidays will impact sales, we expect to