begin seeing in the first quarter the impact of the additional sales representatives that started this past summer." (Emphasis added).

89. The statements made by Defendants and contained in the Company's October 3, 2000 and November 14, 2000 releases and in the 3Q:00 Form 10-Q, reproduced herein *supra*, were each materially false and misleading and were known by Defendants to be false at that time, or were recklessly disregarded as such for the reasons stated herein in ¶ 62 *supra*.

90. **500,000 Share Repurchase.** On December 6, 2000, Defendants issued a release which announced that the Board of the Company had authorized the repurchase of up to 500,000 shares of Organogenesis' common stock "at the discretion of management." According to Defendant Laughlin, the decision to purchase the Company's stock was made by the Board because "our Board is sensitive to shareholder dilution and *views current market conditions as an opportunity to purchase shares that the Company considers to be undervalued in view of our prospects*." (Emphasis added). In addition, Defendant Laughlin also stated that "the decision to authorize a stock buyback program demonstrates the confidence our Board has in the Company's future." At the time of this announcement, shares of the Company were trading at approximately $8.00 per share.

91. **Apligraf Sales January 2001.** On February 5, 2001, Organogenesis announced that Apligraf sales had reached another record in January 2001, with 1,771 units sold during that period. In addition, this release again quoted Defendant Arcari who stated that "we are pleased with the acceleration being seen in Apligraf sales growth."

92. **Laughlin on CNBC Power Lunch February 27, 2001.** On February 26, 2001, Organogenesis issued a release which announced the broadening of its 1996 marketing agreement with Novartis Pharma AG -- an agreement which purportedly gave Organogenesis the right for three

years to sell Novartis up to $20 million in equity. Under the purported terms of this deal, Organogenesis would also get funding from Novartis to upgrade the Company's manufacturing plants and equipment. The following day, February 27, 2001, Defendant Laughlin appeared on nationally televised cable news show CNBC Power Lunch, during which he was interviewed by Bill Griffeth, and stated the following:

> GRIFFETH: What kind of an increase in revenue do you expect from this expansion of the deal with Novartis?
>
> LAUGHLIN: Let me just run through the deal. And you are right, *it is a turning point for us. It is a major improvement in our economic situation.* Unfortunately, I can't give you the precise details of the deal but let me --
>
> LAUGHLIN: [L]et me tell you the major elements of what it is. We have granted Novartis the rights to two additional living tissue products, one that will be entering clinical trials in the next 30 to 60 days and one that is in research. In exchange for that, we will receive a substantial increase in the percentage of the revenue for our living tissue product, which is actually on the market today, called Apligraf. *We will also receive funding for a number of different areas which will enable us to expand our business, get into additional markets and drive down our costs. We also received a $20 million stock put. So any time during the next three years we are able at our discretion and our option to sell Novartis $20 million of shares. We may or may not do that, but it is a wonderful safety net to have in our pocket.*
>
> GRIFFETH: Right. Now, as far as the product agreement goes, though, I know you are meeting with Wall Street analysts to talk about this. Are you raising guidance, though, as far as revenue for this year as a result of this?
>
> LAUGHLIN: What we are doing and the thing people have been most interested in is giving them guidance on our profitability. *What we now feel with the increased revenue, with the funding support that we will get, we are now targeting to pass through break even and reach profitability in the second quarter of next year - sorry, the third quarter of next year.*

> GRIFFETH: Third quarter of next year. OK. And as a result of this, I am curious, I mean are you finding or at least receiving approval for new applications for Apligraf? I am wondering why Novartis is doing this now. I know I should ask them but maybe you can provide some guidance on that.
>
> LAUGHLIN: I think they are truly convinced that there is major business here.... Everything is coming together. I think they are saying, yes, this is working. *This is going to be a very big business. Let's get into it deeper. Let's commit to the business.*
>
> \* \* \*
>
> GRIFFETH: Now ... *when you provide this guidance for break even, is that a part of that guidance of the anticipated approval of those products and when they might be available for market?*
>
> LAUGHLIN: *As we look into the things that go into our break even we are targeting to reach break even with or without those approvals.* One thing that we will hit before break even is we hope to be approved for launch into the European market in approximately the second quarter of next year. [Emphasis added].

At the time of this interview shares of Organogenesis traded at above $12.00 per share.

93.    The statements made by Defendant Laughlin during the February 27, 2001 CNBC interview and those statements made by Defendants and contained in the Company's February 5, 2001 release, reproduced herein *supra*, were each materially false and misleading and were known by Defendants to be false at that time, or were recklessly disregarded as such for the reasons stated herein in ¶ 62 *supra*.

94.    **Needham Report.**    Following Defendant Laughlin's well-received CNBC appearance, analysts at Needham & Co. issued a report on Organogenesis, initiating a "BUY" rating and a near term price target of $18 per share on Organogenesis' stock, and stating the following:

INVESTMENT OPINION

> We are initiating coverage of Organogenesis Inc. with a *BUY rating and a 12-month target price range of $16-$18*. Management of skin disorders requiring tissue replacement represents a major unmet need. A leader in its segment of the $400B healthcare arena of regenerative medicine, ORG has developed Apligraf currently approved for two of the most common chronic wounds - venous stasis ulcers and diabetic foot ulcers ... *Apligraf sales continue to break volume records*, assisted by the recent approval for diabetic foot ulcers as well as expanded coverage by Medicare in August 2000 ... ORG's off-the-balance sheet strength such as the *recently expanded relationship with Novartis,* the enhanced management team under CEO Philip Laughlin (formerly President of Cardiac Surgery Business at Medtronic), *and the proven scientific team will help promote the product portfolio.*

* * *

> A Compelling Valuation. We believe ORG is currently undervalued compared to its peers in the regenerative medicine biology space. Applying two methods of valuation (market capitalization to revenue ratio of 11x as well as P/E ratio of 35x) to our 2004 estimates and discounting back at 10% annually, *we arrive at a 12-month target range of $16-$18.* [Emphasis added].

95. **Apligraf Sales 2/01.** On March 5, 2001, Organogenesis announced that sales of Apligraf had reached another monthly record, with 1,729 units sold in February 2001. In addition, this release again quoted Defendant Arcari who stated that *"Apligraf sales are showing sustained growth acceleration.* Average daily sales in February **surpassed** those in January, and both are ahead of the level seen in our record fourth quarter. *We are particularly pleased with this acceleration, because under the recently amended agreement with Novartis, Organogenesis now receives significantly higher payments for Apligraf."* (Emphasis added).

96. **4Q and FY:00 Results.** On March 30, 2001, Organogenesis issued a release published on *Business Wire* which purported to announce financial results for 4Q and FY:00, as follows:

> For the three months ended December 31, 2000, total revenues were $1.5 million compared with $0.9 million for the same quarter in 1999 .... Total operating costs and expenses were $8.5 million during 4Q:00 compared with $8.9 million for the same quarter in 1999 .... Net loss was $7.1 million ($0.21 per share) for 4Q:00 compared with a net loss of $8.4 million ($0.27 per share) for the same quarter in 1999.
>
> For the year ended December 31, 2000, total revenues were $10.2 million compared with $2.7 million in 1999 .... The 2000 full-year revenues include a $5 million milestone payment from Novartis for our achievement of FDA approval of Apligraf for diabetic foot ulcers. Full-year revenues also include $1.1 million in research and development support from Novartis recognized in 2000 under SAB 101. Total operating costs and expenses were $31.6 million in 2000 compared with $30.6 million in 1999 .... Net loss was $22.3 million ($0.66 per share) in 2000 compared with a net loss of $28.4 million ($0.93 per share) in 1999. When the one-time cumulative effect charge against income due to adoption of SAB 101 is included, the 2000 net loss becomes $28.6 million ($0.85 per share).

In addition to the foregoing, Defendant Laughlin also stated that Defendants were also keeping a tight control over expenses and costs and that Apligraf sales were driving revenues, as follows:

> Our increased product revenue in the fourth quarter reflects a significant increase in our unit sales growth rate, compared to the prior quarter. Our 1Q:01 financials will show an ***important increase in revenue due to a continuation of this higher unit growth rate*** as well as the significantly higher revenue per unit which we now receive from Novartis. ***We are keeping a tight control on our corporate expenses while implementing programs to reduce our manufacturing costs.*** [Emphasis added].

97.   **2000 Form 10-K.** The same day, March 30, 2001, Organogenesis also filed with the SEC its financial results for full year 2000, pursuant to Form 10-K signed by Defendants Laughlin, Erani and Arcari, among others. In addition to repeating many of the same misrepresentations made in the Company's release, the 2000 Form 10-K also stated that:

> Based upon our current plans, ***we believe existing working capital at December 31, 2000, together with the proceeds of product and other***

> *revenues in 2001 and proceeds available from exercising a portion or all of a $20,000,000 equity security put with Novartis, which is at our discretion, will be sufficient to finance operations through at least the first 1Q:02.* We expect to raise additional funds in 2001 through equity financing. [Emphasis added].

98.     During April 2001, Organogenesis also hosted presentations at additional analyst conferences, including, but not limited to, the Tucker Anthony Sutro Capital Markets 2001 Health Care Conference, held at the Ritz Carlton in Laguna Niguel, CA, and the Fifth Annual American Stock Exchange Emerging Growth Conference, held at the Grand Hyatt Hotel in New York City. On or about April 17, 2001 analysts at Needham & Co. reiterated their prior "BUY" rating and continued to encourage investors to expect a near-term price target of $18 per share.

99.     The statements made by Defendants and contained in the Company's March 5, 2001 and March 30, 2001 releases and those statements contained in Organogenesis' 2000 Form 10-K, reproduced herein *supra*, were each materially false and misleading and were know by Defendants to be false at that time, or were recklessly disregarded as such for the reasons stated herein in ¶ 62 *supra*.

100.     **1Q:01 Results.** On April 27, 2001, Defendants announced more purported good news. That day, the Company published a release, announcing results for 1Q:01, with product revenues "nearly triple over prior year period." This release also stated that the Company had made another amendment to its marketing agreement with Novartis, which purportedly gave Organogenesis "significantly higher payments" on sales of Apligraf as well as additional funding support. In addition, this release also stated that:

> For the three months ended March 31, 2001, total revenues were $2.5 million compared with $1.2 million for the same quarter in 2000. Product sales to a related party were $1.8 million in 1Q:01, compared with $0.6 million for the same period in 2000, due to increased sales

> of Apligraf and the higher payments Organogenesis now receives from Novartis for each unit of Apligraf.
>
> Total operating costs and expenses were $8.6 million during 1Q:01 compared with $7.3 million for the same quarter in 2000. The 1Q:01 cost of product sales increased by $0.7 million due to increased sales of Apligraf. During the same period, research and development costs increased by $0.6 million due to increased clinical, process development and product development expenses. General and administrative expenses decreased slightly. Net loss was $6.5 million ($0.19 per share) for 1Q:01 compared with a net loss of $6.4 million ($0.21 per share) for the same quarter in 2000. When the one-time cumulative effect in change in accounting principle ... due to the adoption of SEC Staff Accounting Bulletin No. 101 - "Revenue Recognition in Financial Statements" is included, the 1Q:00 net loss becomes $12.8 million ($0.41 per share).

This release also quoted Defendant Arcari, as follows:

> Our product margin improved significantly over last year. Not only did product revenue increase, but per unit costs decreased as a result of process improvements. ***We tightly controlled our corporate expenses while increasing our investment in process development to further reduce manufacturing costs.*** Under our amended agreement with Novartis, we received nearly $1.0 million in 1Q:01 for manufacturing facility improvements. [Emphasis added].

101.  The same day, April 27, 2001, Defendants also filed with the SEC the Company's financial results for the 1Q:01, the period ended March 31, 2000, pursuant to Form 10-Q signed by Defendants Laughlin and Arcari. The Company's 1Q:01 Form 10-Q contained the same materially false and misleading financial information as had been announced previously, in addition to reporting, in part, the following:

> Basis of Presentation
>
> -----------------------------------
>
> The accompanying unaudited consolidated financial statements of Organogenesis Inc. have been prepared in accordance with generally accepted accounting principles for interim financial information and

with the instruction to Form 10-Q and Article 10 of Regulation S-X
*... In the opinion of management, the accompanying consolidated financial statements include all adjustments, consisting of normal recurring adjustments, necessary for a fair presentation of the financial position, results of operations and changes in cash flows for the periods presented ....*

\* \* \*

Costs and Expenses

Cost of product sales: Cost of product sales increased 50% to $2,196,000 in the first quarter of fiscal 2001, from $1,467,000 for the comparable quarter last year, due to increased unit sales of Apligraf to Novartis. Cost of product sales includes the direct costs to manufacture and package Apligraf and an allocation of our production related indirect costs. Cost of product sales continues to exceed product sales due to the high costs associated with low volume production. *We expect production volume to increase and our margins to continue to improve during 2001.* [Emphasis added].

102. The statements made by Defendants and contained in the Company's April 27, 2001 release and in the 1Q:01 Form 10-Q, reproduced herein *supra*, were each materially false and misleading and were known by Defendants to be false at that time, or were recklessly disregarded as such for the reasons stated herein in ¶ 62 *supra*.

103. **1.9 Million Share Offering.** Later the same day, April 27, 2001, Organogenesis also announced that it had filed a post-effective amendment to its registration statement covering the offering of an additional 1.9 million shares of common stock. Days later on May 8, 2001, Organogenesis published a release on *Business Wire* which announced that the Company had entered into an underwriting agreement with UBS Warburg LLC, as underwriter, providing that on any trading day during the next two years, the Company may elect to issue and sell to the underwriter a number of shares of common stock that is not less than 5% and not more than 25% of the average

trading volume of the common stock on the American Stock Exchange for the previous five days, up to an aggregate of 1,900,000 shares.[1]

104. Following the announcement and report of results for 1Q:01, analysts at Needham & Co. again reiterated a "BUY" rating on shares of Organogenesis and continued to advise investors to expect a near-term trading price of $18 per share for the Company.

105. **Laughlin Quits.** On May 16, 2001, the Company issued a release announcing that Defendant Laughlin had suddenly resigned from Organogenesis and that Michael Sabolinski, former Senior Vice President of Medical and Regulatory Affairs, would become President, Chief Executive Officer and a member of the Board of the Company. According to the Company's release, Defendant Sabolinski was primarily responsible for the development of Apligraf. In addition, the release also noted that, "this transition occurs at an important time for Organogenesis as the Company focuses on increasing market penetration with Apligraf and leveraging core technologies to commercialize new products." While no reason was given for Defendant Laughlin's departure, Defendant Sabolinski was quoted in this release as thanking Defendant Laughlin for "all he achieved for Organogenesis."

106. **$13.5 Million Equity Offering.** On or about May 17, 2001, Defendants again capitalized on the artificial inflation in the price of Organogenesis' shares that their false and misleading representations had caused, and filed a Prospectus with the SEC in connection with the sale of 1.9 million shares of Organogenesis' common stock priced at $7.75 per share. Gross proceeds from the sales of these shares was estimated, at that time, at over $13.5 million. According

---

[1] The sale price of the shares to the underwriter was to be the volume-weighted average price per share at which shares of the common stock traded on the American Stock Exchange during regular trading hours on each purchase date less the underwriter's commissions.

to the Prospectus, this offering was part of the Company's previously filed, 3.0 million share Shelf Registration Statement.

107. **Apligraf Sales 5/01.** On June 5, 2001, Organogenesis announced that sales of Apligraf had again reached above 1,750 units for May 2001. According to Defendant Sabolinski, who was quoted in the Company's release: *"The May sales figures show sustained support for Apligraf use, and we have accelerated our plans to ramp up production to meet the strong growth forecast for [the] second half of this year."* (Emphasis added).

108. While sales for May 2001 were actually less than April sales (1,758 units v. 1,813 units), Defendants did not revise guidance in any way and continued to advise analysts and investors that the Company was still on track to register sequential growth in unit sales and achieve profitability. As evidence of Defendants' further representations, on June 6, 2001, analysts at Needham & Co. reiterated a **"BUY"** rating on shares of the Company, continued to maintain a near-term price target of $18.00 per share and stated that the slowdown in Apligraf was merely a "Bump in the Road" for Organogenesis.

109. **$1.44 Million Private Placement.** On June 18, 2001, Organogenesis raised another $1.44 million through the sale of shares of stock through the UBS Warburg underwriting previously announced. Pursuant to this agreement, between May 21, 2001 and June 18, 2001, Defendants caused the Company to sell over 186,000 shares of stock for at least $1.44 million.

110. **Apligraf Sales 7/01.** On August 2, 2001, Organogenesis announced that sales of Apligraf reached another monthly record sales level of 2,015 units sold in July 2001. This release also quoted Defendant Sabolinski as stating that: *"We are delighted with the growth in sales seen between June and July. Apligraf unit sales have multiple drivers in place ... We are planning*

*accelerating growth in Apligraf production to meet the increasing demand anticipated."* (Emphasis added).

111. **$10 Million Equity Sale to Novartis.** On August 7, 2001, Organogenesis issued a release announcing that it had elected to sell $10 million in equity to Novartis, pursuant to the terms of its amended $20 million stock sales agreement.

112. **2Q:01 Results.** On August 13, 2001, Defendants published a release on *Business Wire*, which purported to announce financial results for 2Q:01, the period ended June 30, 2001, which stated that there was "sustained market demand for Apligraf and the Company accelerated its plans to ramp up production to meet the strong sales forecast for the second half of this year," in addition to the following:

> Reflecting the growth in product sales and the 2001 amendment to the agreement with Novartis, for the three months ended June 30, 2001, product sales to a related party were $1.7 million in 2001 compared with $0.7 million for the same period in 2000. Total operating revenues were $2.1 million in 2Q:01 compared with $1.3 million for the same quarter in 2000, excluding a $5 million milestone payment from Novartis for the approval of Apligraf for diabetic foot ulcers. Total operating costs and expenses were $9.1 million during 2Q:01 compared with $8.0 million for the same quarter in 2000, excluding a $1.2 million ($0.04 per share) one-time severance expense in 2001 for a former executive officer. Cost of product sales increased by $1.3 million due to increased sales of Apligraf and ramping up production to meet anticipated increased demand; research and development as well as general and administrative costs slightly decreased. Net loss was $8.6 million ($0.25 per share) for 2Q:01 compared with a net loss of $1.8 million ($0.05 per share) for the same quarter in 2000.
>
> * * *
>
> [Defendant] *Arcari said, "Our year-to-date revenue from product sales is nearly triple that of the same period last year. Our cost of goods per unit compares favorably with the same period last year,* but is up moderately from the previous quarter due to accelerating our

plans to ramp up production. To strengthen our cash position, we have exercised our right to sell Novartis $10 million in equity. *We retain the right to sell Novartis an additional $10 million in equity."* [Emphasis added].

113. **2Q:01 Form 10-Q.** The following day, August 14, 2001, Defendants also filed with the SEC the Company's financial results for 2Q:01, the period ended June 30, 2001, pursuant to Form 10-Q signed by Defendants Sabolinski and Arcari. The Company's 2Q:01 Form 10-Q contained the same materially false and misleading financial information as had previously been announced, in addition to reporting, in part, the following:

> Basis of Presentation
>
> ----------------------------------
>
> The accompanying unaudited consolidated financial statements of Organogenesis Inc. have been prepared in accordance with generally accepted accounting principles for interim financial information and with the instructions to Form 10-Q and Article 10 of Regulation S-X .... *In the opinion of management, the accompanying consolidated financial statements include all adjustments, consisting of normal recurring adjustments, necessary for a fair presentation of the financial position, results of operations and changes in cash for the periods presented....*
>
> * * *
>
> COSTS AND EXPENSES
>
> Cost of product sales: Cost of product sales for the quarter ended June 30, 2001 increased 82% to $2,837,000, from $1,557,000 for the comparable quarter last year. Cost of product sales for the six-month period ended June 30, 2001 increased 66% to 5,033,000, from $3,024,000 for the comparable period last year. These increases were due to increased unit sales of Apligraf to Novartis, additional scrap costs and higher allocations of depreciation and occupancy costs. Cost of product sales includes the direct costs to manufacture, quality inspect and package Apligraf and an allocation of our production-related indirect costs. Cost of product sales continues to exceed product sales due to the high costs associated with low

volume production. *We expect production volume to increase and our margins to continue to improve during 2001. We expect that we will have to revise standard costs and the allocation of costs to product sales in the future as we continue to modify our manufacturing processes.* [Emphasis added].

114. In addition to the foregoing, the 2Q:01 Form 10-Q also reported that the Company paid severance to a retiring senior executive, as follows:

Severance Agreement:

-----------------------------------

In May 2001, we entered into a separation of employment agreement with a former executive officer, which resulted in the recording of a one-time severance expense of $1,233,000 during the quarter ended June 30, 2001. The separation of employment agreement provides for amounts to be paid over two years and supercedes the previous employment agreement. It has been filed as exhibit 10(ff) to this Form 10Q.

Attached to the 2Q:01 Form 10-Q was a copy of Defendant Laughlin's May 2001 Severance Agreement which reported that the vast majority of the Company's $1.233 million charge was to cover the cost of payments made by Organogenesis directly to Laughlin.

115. The statements made by Defendants and contained in the Company's 8/2/01 and 8/13/01 releases and those contained in the Company's 2Q:01 Form 10-Q, reproduced herein *supra*, were each materially false and misleading and were know by Defendants to be false at that time, or were recklessly disregarded as such for the reasons stated herein in ¶ 62 *supra*.

116. **Needham Report.** The materially false and misleading statements issued by Defendants had their intended effect. Following the publication of Organogenesis' 2Q:01 results on August 14, 2001, Needham issued another report on the Company which again reiterated a "BUY" rating and issued a near-term price target of $18 per share and stated the

following:

> We reiterate our BUY rating and 12-month target range of $16-$18. We used two methods to reach this valuation target. In the first instance, we applied a market capitalization to revenues ratio of 11x for the year 2004. In the second instance, we applied a 35x multiple to the 2004 estimates. To both these calculations, we used a 10% discount per year, given the fact that Apligraf is already on the market thereby less product uncertainty exists. Using these metrics, we arrived at a target price range of $16-18.

117. **Apligraf Sales August 2001.** On September 2, 2001, Organogenesis issued a report which announced that sales of Apligraf reached another monthly record sales level with 2,150 units sold in August 2001. This release also quoted Defendant Sabolinski, who stated that: *"We are pleased with the sustained strength in Apligraf sales that has been seen through the summer months. We are on track for 3Q:01 to have substantially higher sales than our record second quarter."* (Emphasis added).

118. On September 7, 2001, Defendants published a release which purported to announce that Organogenesis had increased its capacity to manufacture Apligraf. Accordingly, the Company's release quoted Defendant Sabolinski, who stated the following:

> *"Our Company is now producing Apligraf at a rate of over 40,000 units per year.* I am pleased that the manufacturing ramp-up I committed to when I became CEO in May is on track. We anticipate increasing this production rate in the near term to meet forecasted demand. The demand has been driven by an increase in sales and marketing activity, the diabetic foot ulcer supplement approval, and favorable reimbursement policies in the hospital and physician's office." [Emphasis added].

119. On or about September 21, 2001, Dow Jones news service reported that Apligraf had received Medicare reimbursement in all 50 states.

120. **3 New Products.** On September 24, 2001, Organogenesis issued a release announcing that its experiences selling Apligraf had been so successful that Defendants would begin commercializing three additional new proprietary products during 4Q:01. According to this release, these products would be marketed directly by Organogenesis using its own marketing personnel and this purportedly would *"advance the Company from a research, clinical/regulatory, manufacturing Company to a fully integrated medical products Company."* (Emphasis added). This release also quoted Defendant Sabolinski, as follows:

> Commercializing our own products, with our own sales and marketing team, brings Organogenesis to *a new stage*. We receive the full revenue from the products we commercialize ourselves, which will add to our revenue stream beginning in October. *We look forward to these products contributing to the overall profitability of the Company.* Having our own sales force also paves the way for Organogenesis commercializing additional products in the future. [Emphasis added].

121. **Apligraf Sales 3Q:01.** On October 4, 2001, Organogenesis issued a release which purported to announce strong sales of Apligraf during 3Q:01, with 6,606 Apligraf units sold during the quarter. In addition to the foregoing, this release also quoted Defendant Sabolinski, who stated that: *"This has been a very significant quarter for the Company.* Apligraf sales continue to increase and the product is now reimbursed by Medicare in all fifty states.... In addition, we received marketing clearance for the third FortaFlex(TM)-based product, FortaGen(TM), and plan to launch four new products in October by an Organogenesis' institutional sales force." (Emphasis added).

122. **$20.25 Million Additional Funding.** On October 16, 2001, Organogenesis issued a release which announced that Defendants had raised another $20.25 million from several financing activities, including another $10 million from Novartis and an additional $10.25 million from two equity placements to institutional investors and/or Company directors. One of the placements was

made via the sale of the 1.67 million registered common shares remaining under the Company's existing shelf registration; the second placement was for 503,876 unregistered shares of common stock and attached warrants. This release also quoted Defendant Sabolinski who stated that: "We are pleased to have completed this round of financing, an important step in achieving key corporate milestones including realizing profitability sooner. Furthermore, *these proceeds will enable us to accelerate additional key programs for our lead product, Apligraf, and other notable products in our development pipeline.*" (Emphasis added).

123. On November 1, 2001, Dow Jones news service reported that Defendants had registered at least 2.7 million shares of common stock on behalf of certain shareholders. According to this report, of the shares registered 2.18 million were issuable to Novartis upon conversion of a $10 million 7% convertible subordinated promissory note that matures 3/29/04. In addition, at this time, Organogenesis also registered at least 503,876 shares issued to two of the Company's directors and an investor in a private equity transaction on Sept. 5. According to this report, Organogenesis would receive no proceeds from the sale of the shares by the stockholders.

124. **3Q:01 Results.** On November 13, 2001, Defendants published a release on *Business Wire*, which purported to announce financial results for the 3Q:01, the period ended September 30, 2001, which stated that:

> Organogenesis Inc. today reported its financial results for the third quarter and nine months ended September 30, 2001. Product sales to a related party were $2.2 million in 3Q:01, representing a 211 % increase over $0.7 million for the same period in 2000. This increase reflects the growth in Apligraf(R) unit sales and the new pricing in the 2001 amended agreement with Novartis. Total revenues increased 124% to $3.0 million in 3Q:01 compared with $1.3 million for the same quarter in 2000. Total operating costs and expenses were $9.8 million during 3Q:01 compared with $7.7 million for the same quarter in 2000. Cost of product sales increased by $1.7 million due

to increased sales of Apligraf and costs related to ramping up production to meet anticipated future increased Apligraf demand.

Research and development costs decreased slightly to $4.1 million compared to $4.4 million in 2000. Selling, general and administrative costs increased by $0.7 million primarily due to selling expenses related to preparations for the commercial launches of the Company's FortaPerm(TM), FortaGen(TM) and Revitix(TM) products. Net loss was $7.4 million or $0.21 per share for 3Q:01 compared with a net loss of $6.7 million or $0.19 per share for the same quarter in 2000.

Again, Defendant Sabolinski was quoted in the Company's release as follows:

Our latest financial results reflect our strategy of implementing programs to support the success of Apligraf, while embarking on initiatives that will position us to capitalize on additional opportunities in the emerging tissue engineering sector.

125.    **3Q:01 Form 10-Q.** The following day, November 14, 2001, Defendants also filed with the SEC the Company's financial results for 3Q:01, the period ended September 30, 2000, pursuant to Form 10-Q, which was signed by Defendants Sabolinski and Arcari. The Company's 3Q:01 Form 10-Q contained the same materially false and misleading financial information as had previously been announced, in addition to reporting, in part, the following:

Basis of Presentation

----------------------------------

The accompanying unaudited consolidated financial statements of Organogenesis Inc. have been prepared in accordance with generally accepted accounting principles for interim financial information and with the instructions to Form 10-Q and Article 10 of Regulation S-X ... *In the opinion of management, the accompanying consolidated financial statements include all adjustments, consisting of normal recurring adjustments, necessary for a fair presentation of the financial position, results of operations and changes in cash flows for the periods presented ....*

\* \* \*

COSTS AND EXPENSES

Cost of product sales: Cost of product sales for the quarter ended September 30, 2001 increased 110% to $3,268,000, from $1,557,000 for the comparable quarter last year. Cost of product sales for the nine-month period ended September 30, 2001 increased 81% to $8,301,000, from $4,581,000 for the comparable period last year. These increases were due to increased unit sales of Apligraf to Novartis, higher allocation of depreciation and occupancy costs, and increased scrap charges during the month of September due to the suspension of commercial sales of Apligraf following the September 11, 2001 terrorist attack. Cost of product sales includes the direct costs to manufacture, quality inspect and package Apligraf and an allocation of our production-related indirect costs. Cost of product sales continues to exceed product sales due to the high costs associated with low volume production. *We expect production volume to increase and our margins to continue to improve during the remainder of 2001. We expect that we will have to revise standard costs and the allocation of costs to product sales in the future as we continue to modify our manufacturing processes.* [Emphasis added].

126.  The statements made by Defendants and contained in the Company's 9/2/01, 9/24/01, 10/16/01, 11/13/01 releases and those statements contained in the Company's 3Q:01 Form 10-Q, reproduced herein *supra*, were each materially false and misleading and were known by Defendants to be false at that time, or were recklessly disregarded as such for the reasons stated herein in ¶ 62 *supra*.

127.  **Needham Report.** On November 16, 2001, with shares of the Company now trading at just above $4.00 per share, analysts at Needham & Co. were finally forced to adjust downward their near-term Organogenesis' price target to $9.00-$11.00 per share from $16.00-$18.00 per share. At this time, however, Needham analysts did not reduce the "BUY" rating on the Company; they also stated that at current trading levels shares of Organogenesis were "currently undervalued" and the following:

> We believe that Organogenesis is *currently undervalued*, given that Apligraf is the first and only product containing living human cells to prove efficacy and gain FDA PMA marketing approval and now having qualified nationally for reimbursement under Medicare for outpatient use. ***ORG's enhanced management team and Novartis agreement is a further indicator of ORG's potential.*** In addition, we believe there will be a number of key events over the next several quarters that will serve to significantly increase the visibility of Organogenesis and its products and further attract substantial investor interest in the company and its products, such as continued growth in Apligraf sales and postmarketing research as well as progression of VTTRIX clinical trials. [Emphasis added].

128. On January 4, 2002, only days before the end of the Class Period, Defendant Erani announced his sudden and unexpected departure from Organogenesis. According to the Company's release, Defendant Erani resigned to "pursue personal business interests."

### THE TRUE FINANCIAL AND OPERATIONAL CONDITION OF ORGANOGENESIS IS BELATEDLY DISCLOSED

129. **No Money to Fund Operations.** On or about January 30, 2002, Defendants filed with the SEC a report pursuant to Form 8-K signed by Defendant Arcari, which stated for the first time that the Company was running out of money and that it would be forced into insolvency unless it could raise at least $15 million in the immediate near term. The Form 8-K stated, in part, the following:

> On January 30, 2002, the Registrant filed a Registration Statement on Form S-3 to register the resale of shares held by certain of its selling security holders. As a part of that document, the Registrant included an updated set of risk factors relating to its business. The Registrant intends, by filing such updated risk factors with this Current Report on Form 8-K, to provide such risk factors as part of its documents filed pursuant to the Securities Exchange Act of 1934.
>
> \* \* \*
>
> We have incurred significant operating losses in funding the research, development, testing and marketing of our products in every year of

our existence. We incurred net losses of $14,031,000 for the year ended December 31, 1998, $28,350,000 for the year ended December 31, 1999, $28,605,000 for the year ended December 31, 2000 and $22,561,000 for the nine months ended September 30, 2001. *The extent of future losses and the time required to achieve profitability are highly uncertain, and we may never achieve a profitable level of operations or, even if we achieve profitability, we may not be able to sustain it on an ongoing basis.* [Emphasis added].

130.  In addition to the foregoing, the January 30, 2002 Form 8-K also revealed that the Company would need to raise additional funds by the end of the 1Q:02, but that Organogenesis might be unable to raise such necessary funds, in which case it would then be forced to *curtail or discontinue all operations.* In this regard, the Form 8-K also stated, in part, the following:

> We will need to raise additional funds by the end of 1Q:02, but may be unable to raise the funds, in which case *we would have to curtail or discontinue our activities.* [Emphasis added.]
>
> We will seek to raise $15 million from the sale of equity securities that have not been registered under the Securities Act of 1933; such securities may not be sold in the United States absent registration or an exemption from registration. Based upon our current forecasts, we believe that proceeds from proposed equity financing of approximately $15 million, together with our existing cash, cash equivalents and credit line and product and other revenues, will be sufficient to finance operations through at least the next twelve months. This projection is based on assumptions regarding our operating cash requirements and revenues from sales of Apligraf and other products, any of which could prove to be incorrect. We are currently seeking additional funding but our research, development, manufacturing and other activities may require that we raise substantial additional funds. We may not be able to obtain the proposed $15 million in new financing or any additional funding on terms favorable to us or our stockholders, if at all. Equity financing would dilute your ownership in us.

131.  In answer to the question as to why the Company could not access the $10 million that Defendants had previously reported would be available, the Form 8-K revealed that the Novartis