commitment was subject to certain conditions – ones the Company had no way of satisfying, such

that this money was also not available – and the following:

> *Although we have a contractual put option to sell an additional $10 million of our securities to Novartis, we must satisfy a number of conditions in order to exercise that option.* If we do not satisfy these conditions and Novartis is unwilling to waive any unsatisfied conditions, we will be unable to sell additional securities to Novartis pursuant to the put option. In addition, even if we satisfied the conditions, the closing would occur no sooner than 90 days following the day we send the put option exercise notice. If adequate funds are not available to us when needed, we will be required to delay, scale back or eliminate our research and development programs or license to third parties products or technologies that we would otherwise undertake to develop ourselves and otherwise reduce our level of operations. *The failure to have adequate liquidity could result in our receiving a "going concern" opinion from our auditors.* [Emphasis added].

132.    While shares of the Company made virtually no move on the day the Company's

Form 8-K was filed, in the days immediately before its filing shares of the Company dropped

precipitously – falling over 40% due to leakage in the three days prior to its filing with the SEC.

Prior to this sudden and inexplicable decline, which occurred on volume abnormally above the

stock's daily average, shares of Organogenesis traded at approximately $3.70 per share on January

28, 2002. The day the Form 8-K was filed, Organogenesis' shares traded at $2.44 per share, and

within days, as investors digested the implications of the Company's SEC filing, shares of

Organogenesis fell to as low as $1.32 per share on February 7, 2002 -- a decline of almost 95%

compared to the Class Period high of over $22.00 per share reached on March 7, 2000.

133.    Later, on February 25, 2002, *Dow Jones* news service reported that Organogenesis

had declared that it would engage in a "restructuring" and would lay-off at least 16% of its workforce

in order to cut overhead by at least $5 million. Also, according to *Dow Jones*, on March 21, 2002,

the Company achieved its goal of raising the $16 million necessary to continue operations by issuing "convertible preferred shares," convertible into shares of common stock of the Company at a fixed conversion price of $1.45 per share. The "vulture capitalists" who arranged for these "toxic convertible"[2] as well as the purchase of an additional 7.2 million shares for payments of only $10 million were identified by the Company only as "institutional shareholders."

134.    On April 3, 2002, Organogenesis announced sales of Apligraf for 1Q:02 which, at 7,100 units, were well below forecast sales for 2002 of 40,000 units -- about 30% below that figure. Following the release of 1Q:02 results, on April 11, 2002, Defendants hosted a conference call, the transcript of which was subsequently published. During the question and answer call-in section, the following statements were also made:

> BRUCE BREWSTER (ph), BREWSTER ASSET MANAGEMENT:
> Over the last number of years it seems to be that you have been very successful from a medical point of view. And from the point of view of sales of Apligraf. *I don't think we can say the same thing about the business results.*
>
> *It seems to me that the underlying reason for your lack of success, from a business point of view, is your original deals with Sandos (ph) and Nuvurtis and the amount of revenue that you get from the sale of Apligraf:*
>
> You're entering into - you did adjust that recently – you're entering into new transactions with other partners. Are these transactions organized in such a way that you'll have more possibility of overall profitability and therefore business success?
>
> * * *

---

2    "Toxic," because the more Organogensis' share price declined, the more stock the Company would have to issue to meet this obligation, the greater the shareholder dilution, and the lower the price of the stock.

RICHARD CARAFF (ph), OPPENHEIMER: Yes, I certainly am pleased to hear of approval by the 50 states and hope that word gets out to the doctors, many of whom at least in our limited experience in Boston are not completely aware.

But that other part which is a question, *some doctors that I've spoken to are very happy and satisfied with using Apligraf on complex cases. But they complain on less complex cases Apligraf is a rather expensive procedure to use compared to other procedures.* Do we have any way of broad [sic] the market by means of price? Could you comment upon that please?

STEVEN BERNITZ: *I think the major - if in looking at the cost of the product should be [sic] in looking at the pharmo-economics of the product rather than the price of the product.*

\* \* \*

There have been some studies with venous leg ulcers that show that Apligraf can be a very cost effective treatment for those. And actually given that, one would expect that data for diabetic foot ulcers to be more compelling.

And I think that you also touched on another important point which is the knowledge and confidence in the reimbursement process, which is that a doctor may have tried the product, a year or so ago and or heard from a doctor that tried the product a year or more ago and had some difficulty, or had to go through a rigorous approval process to get the product reimbursed. [Emphasis added].

135.    In addition to the foregoing, when asked about the why the Company could not access

the second $10 million tranche of the aforementioned Novartis commitment, Defendants stated the

following:

JOHN BERGER (ph): Could you also go over briefly the encumbrances on the second tranche of capital from - that's available from Novartis? And when that tranche would be available to be utilized since this latest financing.

JOHN ARCARI: Well the second put is equal in amount to the first. It's 10 million. The time period between exercising a put and receiving money is a minimum of 90 days. *But the thing that really*

> *distinguishes the second put from the first is the hurdles you have to get through on the second put.*
>
> *And they're inherently more difficult. There are more hoops to jump through. So it's much more difficult to access that money than was the first tranche.*
>
> STEVEN BERNITZ: So we look at that as an upside. If it is available *there's no where in our plans that we are counting on that money.* And we don't anticipate exercising that put. [Emphasis added].

136.    **Going Concern Opinion.** On April 16, 2002, when the Company filed its year end financial statement with the SEC, pursuant to Form 10-K, its outside auditor PricewaterhouseCoopers LLP issued a "going concern" opinion, which stated that the auditors doubted Organogenesis' ability to continue as a going concern. According to PricewaterhouseCoopers, "Organogenesis has posted recurring operating losses, has a working capital deficiency and has long-term debt that may become immediately due upon an event of default."

137.    Following this announcement, shares of Organogenesis fell to as low as $0.60 per share on April 16, 2002. In the days that followed, shares of the Company traded even lower, to as low as $0.41 per share by May 1, 2002.

138.    Remarkably, in response to this statement by PricewaterhouseCoopers, the same day, April 26, 2002, Defendants issued a release on *Business Wire* which stated that, although Organogenesis had received the aforementioned report, "we believe that, based on our current forecasts, the Company has sufficient liquidity to finance operations and *achieve break even by year-end 2002."* (Emphasis added). This post-Class Period statement was as far from the truth as Defendants' other statements made during the Class Period. Despite this absurd claim, on August 16, 2002, Defendants revealed that the Company would delay filing its quarterly report for 2Q:02

and that Organogenesis was reviewing a possible material "asset impairment charge." According to a statement made by the Company at this time, "Management is unable to conclude the amount of such impairment or that the financial statements ... are probably presented on a 'going concern' basis rather than on a 'liquidation of assets' basis."

139.    **Needham Rating Suspended.**   It was not until July 12, 2002, with shares of the Company now trading below $0.20 per share, however, that analysts at Needham & Co. finally placed the Company's stock rating "Under Review."   With Organogenesis on "life-support" Needham analysts reported the following:

> Recent events leave *future uncertain.*
>
> *Disappointing sales figures/ higher than expected burn rate.* Organogenesis announced that Apligraf sales decreased approximately 7-10% for 2Q:02, compared with our estimates for an increase in sales of 25%.
>
> Additionally, the company stated that the burn rate for the quarter was $7.5MM versus our estimates of $4.3MM, resulting in $3.7MM of cash at the end of 2Q:02. Additional cost cutting measures have been initiated to lower the burn rate from $2.5MM/month to $1.1MM/month. Using the revised burn rate, Organogenesis will be able to fund operations for 3Q:02 before seeking additional capital.
>
> Challenging management strategy. Organogenesis announced that it has entered into discussions with Novartis Pharma AG to reacquire commercialization rights to Apligraf. However in order to complete negotiations, *Organogenesis must raise sufficient capital necessary to reacquire [rights to] Apligraf and build the necessary infrastructure necessary to market and distribute the product.*
>
> Additionally, Oganogenesis stated that it would seek a corporate partner for the marketing of the Fortagen, Fortaperm, and Revitix product lines. While this decision will result in a reduction of costs related to the sales and marketing infrastructure set up by the company, the partnership will also result in decreased revenues, as revenues become royalty based.

> Our conclusions. Despite the efforts of management, ***Apligraf sales
> continue to grow at a slower than anticipated rate. The lower than
> expected sales growth and higher than anticipated burn rate results
> in approximately 3 months of cash ($3.7MM) for ongoing
> operations, which leaves the company below budgeted forecasts.***
> While major initiatives are being discussed including the reacquiring
> of rights to Apligraf and raising of funds for continued operations, we
> believe that ***multiple challenges exist for Organogenesis.***
>
> Therefore, given the lack of Apligraf sales growth, the lighter than
> expected burn rate, the challenging business strategy undertaken by
> management, and sub-optimal cash position, we are placing our rating
> under review. We are currently evaluating the company's options and
> will continue to monitor events going forward. [Emphasis added].

140.    **Never Achieve Profitability. Huge Layoffs. Halt Apligraf Production.**  On

August 21, 2002, with Organogenesis shares trading at $0.09 per share, ***the Company's common

stock was suspended from trading on the American Stock Exchange.***  On September 13, 2002, the

Company announced that it had temporarily halted shipments of Apligraf and had furloughed over

110 of its employees, as a result of the Company's "current lack of cash flow."  Defendants also

blamed the current crisis upon its inability to renegotiate its marketing agreement with Novartis,

which was described as "unsustainable."  On September 13, 2002, Defendants also revealed that a

Chapter 11 bankruptcy filing was a possibility.

141.    **Product Recalls.**  In addition to the foregoing, by mid September 2002, production

quality at Organogenesis had deteriorated so substantially that an entire batch of Apligraf had been

recalled.  Alarmingly, because Apligraf has such a short shelf life at the time of this "recall," of the

193 affected units at least 72 had already been applied to patients.  In total, this was the fourth time

since 1999 that the Company had been forced to recall Apligraf because of contamination.

142.    **Post Class Period Scheme to Leverage Buyout.**  Having reduced the value of the

Company's stock to mere pennies per share, and having lost the ability to sell more stock or offer

debt or raise money through private or public offerings, Defendants next sought to take what was left of Organogenesis for themselves. Thus, on or about September 25, 2002, Defendants caused the Company to file for Chapter 11 protection from creditors in United States Bankruptcy Court in the Eastern District of Massachusetts.

143.    As Defendants knew throughout the Class Period, Organogenesis could not produce enough cash flow from operations to support its operations under the terms of its agreement with Novartis since it was losing money on each sale under the Novartis agreement. Thus, on November 20, 2002, immediately after Defendants placed the Company into bankruptcy, Defendants forced Novartis to agree to transfer back to them the worldwide marketing and distribution rights for Apligraf. Novartis acquiesced to Defendants' demand, rather than risk losing its entire investment in the Company -- including at least $10 million in unsecured debt which Novartis still hoped to collect.

144.    The following day, November 21, 2002, the *Boston Globe* reported, pursuant to the terms of the proposed, revised deal between Novartis and Defendants:

> The two companies had agreed to work together for another seven months, during which Novartis would continue to market and distribute Apligraf.
>
> When the Company emerges from Chapter 11 bankruptcy protection, marketing and distribution rights will return to Defendants. Two years later, Novartis will earn royalties on sales of Apligraf, lasting for five years.
>
> Novartis also agreed to purchase at least 200 units of the product each week from Defendants.
>
> Novartis also agreed to loan $3 million to Organogenesis, to be repaid 18 months after the company emerges from bankruptcy.

> Novartis agreed to have a $10 million investment it made in the company last year treated as a general claim, to be repaid with other unsecured creditors of Organogenesis.
>
> The pact also provides hope for dozens of employees who were laid off in September, when Organogenesis abruptly shut down, with a minimum of 75 people anticipated to return to work within several weeks of this announcement.

Although the precise payment terms were sealed by the Bankruptcy Court, at that time Organogenesis' vice president and general counsel, Jeffrey L. Dow, stated that: "The prices are considerably more favorable than the $350 a unit we were getting under the old payments. It's clear we are getting the great bulk of the revenue from Novartis' sales ..."

145.    By June 23, 2003, Defendants announced that they had caused the Company to file an Amended Plan of Reorganization with the United States Bankruptcy Court. According to Defendants, the Plan incorporated "a funding proposal from a group of unsecured creditors – including current and former officers and directors of the Company," and put in motion a timeline for emerging from Chapter 11 protection in August 2003. The Plan also anticipated a cash distribution of 35% to be made to the holders of allowed general unsecured claims, but that no distribution would be made on shares of the Company's outstanding preferred and common stock, which would be cancelled on the Plan's effective date. Under the Plan, all shares of new common stock of the Company, as reorganized, would be distributed to the members of the plan funding group and the holder(s) of the $10.35 million allowed claim of Novartis.

146.    Days later, however, on June 26, 2003, the *Boston Globe* reported more disturbing news regarding Defendants' continued interference with the bankruptcy proceeding, and documented their continued attempts to place their own interests over and above the interests of the outside shareholders of the Company:

If all goes as expected at a hearing in US Bankruptcy Court in Boston today, creditors could be solicited next week for their approval of a reorganization plan turning ownership of the life sciences company and its sophisticated medical technology to a group led by two cousins who operate chains of clothing stores like Strawberry and Pay-Half.

Did recently installed chief executive Alan Ades, also a leader of the group in line to buy the company, impede other potential bidders, a tactic that could have protected his own financial interests? Did the previous CEO, seemingly ousted last fall, try to use his own inside connections seeking proprietary information for a bid with private investors that could have put him back in charge?

* * *

***Ades, his cousin Albert Erani and a small group of others that includes their relatives would end up with the company at a seemingly modest price,*** though their total cost is hard to calculate...

* * *

Steven Bernitz, the company's chief executive at the time of the bankruptcy filing, quit as he was about to be fired in October and Ades took charge, according to the company. A short time later, the company tracked cell phone calls between Bernitz and another executive still employed at Organogenesis, Jeffrey Dow, and fired him. Company lawyers questioned whether confidential information was being leaked.

Soon, it became clear Bernitz was formally advising a private equity firm circling to make a bid on company assets. ***His lawyer claimed the company was harassing Bernitz because Ades "wants to end up with the company."***

***"He has been very successful at chilling the sale, "the lawyer, Stephen Gordon, said in a transcript of a bankruptcy court hearing.*** [Emphasis added].

147.    Despite Defendants' actions, on August 14, 2003, Judge William Hillman in U.S.

Bankruptcy Court for the Eastern District of Massachusetts in Boston cleared the way for the

Defendants to emerge from bankruptcy with the Company under their full dominance and control

by or about August 26th. The insider group led by interim CEO Alan Ades and his partner and cousin Albert Erani would buy a $10.5 million unsecured claim in the form of a bond held by pharmaceutical giant Novartis. Ades, who co-founded A&E Stores with Erani, would be the interim CEO, president and chairman of the new company. Novartis agreed to convert the $3 million in debtor-in-possession financing it provided into a $3 million exit loan. According to John Hutchins, Boston counsel for Novartis at Kirkpatrick & Lockhart LLP, the final terms of this bankruptcy restructuring actually amounted to a "leveraged acquisition" by the insider group because they had bought up the $10.5 million Novartis unsecured claim and are investing additional funding.

148.    Thus, in less than one year, not only were Defendants successful in thwarting other interested bidders and in facilitating Defendants Erani and Ades and their family members' total control over the Company, but within that time Defendants were also able to cause Organogenesis to emerge from bankruptcy having completed its restructuring plan. As a result of this restructuring, new shares were issued to Defendant Erani and Ades and their family members – the new owners of the Company – and the shareholders who purchased and/or otherwise acquired shares of the Company during the Class Period received nothing for their Organogenesis' shares.

149.    The market for Organogenesis' securities was open, well-developed and efficient at all relevant times. As a result of these materially false and misleading statements and failures to disclose, Organogenesis' securities traded at artificially inflated prices during the Class Period. Plaintiff and other members of the Class purchased or otherwise acquired Organogenesis' securities relying upon the integrity of the market price of Organogenesis' securities and market information relating to Organogenesis and have been damaged thereby.

150.    During the Class Period, Defendants materially misled the investing public, thereby inflating the price of Organogenesis' securities, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and misleading. Said statements and omissions were materially false and misleading in that they failed to disclose material, adverse information and misrepresented the truth about the Company, its business and operations, as alleged herein.

151.    At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiff and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false or misleading statements about Organogenesis' business, prospects and operations. These material misstatements and omissions had the cause and effect of creating in the market an unrealistically positive assessment of Organogenesis and its business, prospects and operations, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times. Defendants' materially false and misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at artificially inflated prices, thus causing the damages complained of herein.

## ADDITIONAL SCIENTER ALLEGATIONS

152.    As alleged herein, Defendants acted with scienter in that each Defendant knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading, knew that such statements or documents would be issued or disseminated to the investing public and knowingly and substantially participated or acquiesced in

the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere in detail herein, Defendants, by virtue of their receipt of information reflecting the true facts regarding Organogenesis, their control over, and/or receipt and/or modification of Organogenesis' alleged materially misleading statements and/or their associations with the Company which made them privy to confidential, proprietary information concerning Organogenesis, participated in the fraudulent scheme alleged herein.

        153.    In addition, throughout the Class Period, while in possession of materially adverse on-public information, Defendants caused the Company to issue and/or register for the sale of millions of shares of Company stock. Defendants were motivated to materially misrepresent to the SEC and investors the true financial condition of the Company in order to raise over $68.1 million in total proceeds from the sales of Organogenesis' securities through public stock offerings, private equity offerings and other debt and/or equity sales, which Defendants failed to utilize in avoiding Organogenesis' bankruptcy. Moreover, as further evidence of Defendants' motivation to engage in the illegal scheme described herein, on or about April 21, 2000, Defendant Stein registered the authorized sale of over $6.9 million of his privately held Organogenesis' stock – approximately half the Company shares he personally owned and controlled. Company insiders, including Defendants Herbert Stein and Michael Sabolinski, took advantage of the artificially inflated prices of the Company's securities during the Class Period by selling their shares of the securities ("Selling Shareholders") and reaping millions of dollars in proceeds therefrom. These insider sales are set forth below:

| INSIDER | DATE OF SALE | NO. OF SHARES SOLD | PRICE PER SHARE | TOTAL VALUE OF SALE |
|---|---|---|---|---|
| Michael L. Sabolinski | 6/20/2000 | 12,208.00 | $3.02 | $36,877.93 |
| Michael L. Sabolinski | 6/20/2000 | 12,208.00 | $10.39 | $126,841.12 |
| Herbert Stein | 4/21/2000 | 732,423.00 | $9.44 | $6,912,242.10 |
| Anton E. Schrafl | 7/20/2001 | 36,623.00 | $2.97 | $108,755.66 |
| Nancy L. Parenteu | 5/14/2001 | 31,331.00 | $3.53 | $110.696.76 |
| Nancy L. Parenteu | 5/11/2001 | 3,666.00 | $3.43 | $12.575.85 |
| Nancy L. Parenteu | 5/10/2001 | 15,000.00 | $8.18 | $122.640.00 |
| Nancy L. Parenteu | 5/9/2001 | 5,000.00 | $8.56 | $42,813.00 |
| Nancy L. Parenteu | 5/7/2001 | 10,000.00 | $9.00 | $90,000.00 |
| Nancy L. Parenteu | 5/7/2001 | 5,000.00 | $8.97 | $44,850.00 |
| **TOTAL** | | **863,462.00** | | **$7,608,292.42** |

154.    The sales of millions of shares of Company stock during the Class Period, which sales were designed and/or permitted by the Individual Defendants as well as numerous other high-level senior executives of Organogenesis, further evidences Defendants' motive to perpetrate the fraudulent scheme detailed herein. In addition, Defendants also caused the Company to engage in the sale of tens of millions of dollars in other sales of Organogenesis' securities pursuant to stock offerings, private equity offerings and other debt and/or equity sales during the Class Period, including the following:

| TRANSACTION | DATE OF SALE | NO. OF SHARES SOLD | PRICE PER SHARE | TOTAL VALUE OF SALE |
|---|---|---|---|---|
| $9.4M Equity Sale | 2/24/2000 | 688,000 | | $9,400,000.00 |
| $1.4M Equity Sale | 2/25/2000 | 100,000 | | $1,400,000.00 |
| $5.27M Equity Sale | 3/09/2000 | 300,000 | | $5,270,000.00 |
| $1.9M Share Offering | 4/27/2001 | 1,900,000 | $7.75 | $13,500,000.00 |
| $1.44M Private Placement | 6/18/2001 | 186,000 | | $1,440,000.00 |
| $10M Equity Sale to Novatris | 8/07/2001 | | | $10,000,000.00 |
| $20.25M additional Funding | 10/16/2001 | 2,173,876 | | $20,250,000.00 |
| **TOTAL** | | | | **$61,260,000** |

**TOTAL ALL DEBT AND EQUITY SALES BY DEFENDANTS AND INSIDERS
DURING THE CLASS PERIOD = $68,868,292**

**Applicability Of Presumption Of Reliance:
Fraud-On-The-Market Doctrine**

155.    At all relevant times, the market for Organogenesis' securities was an efficient market
for the following reasons, among others:

(a)    Organogenesis' stock met the requirements for listing, and was listed and
actively traded, on the American Stock Exchange, a highly efficient and automated market;

(b)    as a regulated issuer, Organogenesis filed periodic public reports with the SEC
and the American Stock Exchange;

(c)    Organogenesis regularly communicated with public investors via established
market communication mechanisms, including through regular disseminations of press releases on
the national circuits of major newswire services and through other wide-ranging public disclosures,
such as communications with the financial press and other similar reporting services; and

(d)    Organogenesis was followed by several securities analysts employed by major
brokerage firm(s) who wrote reports which were distributed to the sales force and certain customers
of their respective brokerage firm(s).  Each of these reports was publicly available and entered the
public marketplace.

156.    As a result of the foregoing, the market for Organogenesis securities promptly
digested current information regarding Organogenesis from all publicly available sources and
reflected such information in Organogenesis' stock price. Under these circumstances, all purchasers
of Organogenesis securities during the Class Period suffered similar injury through their purchase
of Organogenesis securities at artificially inflated prices and a presumption of reliance applies.

## NO SAFE HARBOR

157.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory sate harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Organogenesis who knew that statement was false when made.

## FIRST CLAIM

### Violation Of Section 10(b) Of
### The Exchange Act And Rule 10b-5
### Promulgated Thereunder Against All Defendants

158.    Plaintiff repeats and realleges each and every allegation contained above as if fully sct forth herein.

159.    During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) enable the Individual Defendants and other Organogenesis insiders to sell more than $7.6 million of the Company's and/or their personally-held Organogenesis' common stock to the unsuspecting public; and (iii) cause Plaintiff

and other members of the Class to purchase Organogenesis' securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, jointly and individually (and each of them), took the actions set forth herein.

160.    Defendants (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Organogenesis' securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

161.    Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse, material information about the business, operations and future prospects of Organogenesis as specified herein.

162.    These Defendants employed devices, schemes and artifices to defraud, while in possession of material, adverse, non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Organogenesis' value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about Organogenesis and its business operations and future prospects in the light of the circumstances under which they were made, not misleading, as set forth more particularly

herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of Organogenesis' securities during the Class Period.

163.    Each of the Individual Defendants' primary liability, and controlling personal liability, arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these Defendants, by virtue of his responsibilities and activities as a senior officer and/or director of the Company was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these Defendants enjoyed significant personal contact and familiarity with the other Defendants and was advised of and had access to other members of the Company's management team, internal reports and other data and information about the Company's finances, operations and sales at all relevant times; and (iv) each of these Defendants was aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

164.    The Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts. Such Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Organogenesis' operating condition and future business prospects from the investing public and supporting the artificially inflated price of its securities. As demonstrated by Defendants' overstatements and misstatements of the Company's business, operations and earnings throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged,

were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

165.    As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of Organogenesis securities was artificially inflated during the Class Period. In ignorance of the fact that the market price of Organogenesis' publicly-traded securities was artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trade, and/or on the absence of material, adverse information that was known to or recklessly disregarded by Defendants but not disclosed in public statements by Defendants during the Class Period, Plaintiff and the other members of the Class acquired Organogenesis' securities during the Class Period at artificially high prices and were damaged thereby.

166.    At the time of said misrepresentations and omissions, Plaintiff and other members of the Class were ignorant of their falsity and believed them to be true. Had Plaintiff and the other members of the Class and the marketplace known the truth regarding the problems that Organogenesis was experiencing, which were not disclosed by Defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired their Organogenesis' securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

167.    By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

168.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

## SECOND CLAIM
### Violation Of Section 20(a) Of
### The Exchange Act Against Individual Defendants

169.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

170.    The Individual Defendants acted as controlling persons of Organogenesis within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading.  The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

171.    In particular, each of these Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control

or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

172.    As set forth above, Organogenesis and the Individual Defendants each violated Section 10(b) and Rule l0b-5 by their acts and omissions as alleged in this Complaint.  By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

**WHEREFORE,** Plaintiff prays for relief and judgment, as follows:

A.    Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

B.    Awarding compensatory damages in favor of Plaintiff and the other Class members against all Defendants for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.    Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees;

D.    Awarding extraordinary, equitable and/or injunctive relief as permitted by law, equity and the federal statutory provisions sued hereunder, pursuant to Rules 64 and 65 and any appropriate state law remedies to assure that the Class has an effective remedy; and

E.    Such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

Dated:  March 15, 2004

**GILMAN AND PASTOR, LLP**

_Peter A. Lagorio_

David Pastor (BBO #391000)
Peter A. Lagorio (BBO #567379)
Stonehill Corporate Center
999 Broadway, Suite 500
Saugus, MA  01906
(781) 231-7850
(781) 231-7840 (facsimile)

**BERNSTEIN LIEBHARD & LIFSHITZ, LLP**
Sandy A. Liebhard
Joseph R. Seidman, Jr.
10 East 40th Street, 22nd Floor
New York, NY 10016
(212) 779-1414
(212) 779-3218 (facsimile)

**Counsel for Plaintiff**

00001957.WPD ; 1                        81

## CERTIFICATION OF NAMED PLAINTIFF
## PURSUANT TO FEDERAL SECURITIES LAWS

I, _Christopher Earl Ahee_ ("Plaintiff"), declare the following as to the claims asserted under the federal securities laws:

1.    Plaintiff has reviewed the complaint filed in this matter and has authorized the filing of a complaint based on similar allegations in a related or amended complaint. Plaintiff retains Bernstein Liebhard & Lifshitz, LLP and such co-counsel it deems appropriate to associate with to pursue such action on a contingent fee basis.

2.    Plaintiff did not purchase the security that is the subject of this action at the direction of Plaintiff's counsel or in order to participate in this private action.

3.    Plaintiff is willing to serve as a lead plaintiff either individually or as part of a group. A lead plaintiff is a representative party who acts on behalf of other class members in directing the action, and whose duties may include testifying at deposition and trial. I understand that the litigation is not settled, this is not a claim form, and sharing in any recovery is not dependent upon execution of this Certification.

4.    Plaintiff's transaction(s) in the **ORGANOGENESIS, INC.** security that is the subject of this action during the period of 11/15/99 through and including 1/30/02 are as follows:

| No. of Shares | Stock Symbol | Buy/Sell | Date | Price Per Share |
|---|---|---|---|---|
| | _See Attached_ | | | |

Please list other transactions on a separate sheet of paper, if necessary.

5.    During the three years prior to the date of this Certification, Plaintiff has not sought to serve or served as a representative party for the class in any action filed under the federal securities laws except as indicated here:

6.    Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, or as ordered or approved by the court, including any award for reasonable costs and expenses (including lost wages) directly relating to the representation of the class.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this _28_ day of _February_ 2003.

_Christopher Earl Ahee_
Signature

_Christopher Earl Ahee_
Print Name

## AMEX  ORGG

| No. of Shares | Buy/Sell | Date | Price Per Share |
|---|---|---|---|
| 2,000 | B | 12/8/2000 | $7.00 |
| 2,000 | S | 3/1/2001 | $11 |
| 3,000 | B | 4/9/2001 | $7.00 |
| 3,000 | S | 17-Aug | $9.00 |
| 3,000 | B | 8/28/2001 | $8.30 |
| 3,000 | B | 9/10/2001 | $6.98 |
| 2,000 | B | 10/1/2001 | $5.00 |
| 250 | S | 3/8/2002 | $1.50 |
| 1,450 | B | 3/27/2001 | $7.75 |
| 275 | B | 5/16/2001 | $7.80 |
| 1,725 | S | 7/17/2001 | $7.75 |
| 1,300 | B | 9/10/2001 | $8.45 |
| 165 | B | 12/31/2001 | $4.90 |